Hillsborough, }
Dec. 4, 1923. }

BENJAMIN L. TERRELL *v.* JOHN BARTON PAYNE, *Agent.*

Under U. S. Comp. Stat., 1906, s. 8651, the duty of a carrier to provide "properly equipped pens" for live stock, when unloaded in transit, may be performed by maintaining such pens on the carrier's own land, or by hiring such pens on the land of another; and the carrier has a lien for the feed, water and care, regardless of the location of the pens or who may own them.

Upon a general exception that a carrier was entitled to no lien whatever for the care of live stock in transit, when taken off the train and removed to the land of another, the court will not consider whether the charge was erroneous in not properly defining the extent of the lien.

Where the evidence has not been transferred, an exception to the court's refusal to give an instruction will be overruled, if the refusal would have been proper under any possible circumstances.

CASE, for loss on a carload of horses shipped from Montpelier, Vermont, to Concord, New Hampshire.  Trial by jury and verdict for the plaintiff.

The horses arrived in Concord on a very cold night in February, and the time having arrived when they should be unloaded for food and rest (U. S. Comp. Stat., 1906, ss. 8651, 8652), they were put into open pens without any protection from the weather and caught cold.

Transferred by *Allen*, J., on the defendant's exception to the charge as given and to the court's refusal to charge.  The facts relevant to the exceptions are stated in the opinion.

*Tuttle, Wyman & Starr* and *Robert W. Upton* (*Mr. Wyman* orally), for the plaintiff.

*Warren, Howe & Wilson* (*Mr. Howe* orally), for the defendant.

YOUNG, J.   United States Compiled Statutes 1906, ss. 8651, 8652 make it the duty of a common carrier to unload live stock, which has been confined in a car for twenty-eight hours, into properly equipped pens for feed, water and rest, and the real issue in this case is whether the carrier may take the stock to a stable for that purpose, and, if he does, whether he has the same lien on the stock for expenses that he would have if he fed, watered and rested them on his own right of way.

The law makes it the duty of a common carrier to use ordinary care in doing what he undertakes to do (*Kimball* v. *Company*, 76 N. H. 81), and what the federal statutes make it his duty to do. R. C. L., Supp. vol. 4, *p.* 302, *s.* 451; 10 C. J., *p.* 97.   In other words, the duty the law imposed on the defendant for the plaintiff's benefit when the horses arrived in Concord was to do what the ordinary man would do (1) to provide a suitable enclosure to hold the horses while they were resting, (2) to unload the horses into it and (3) to feed, water and care for them, and if he failed to use such care in respect to any of these things and the plaintiff was damaged by it, the plaintiff can recover, for neither the federal statute nor the contract under which the horses were shipped purports to release the defendant from liability for loss or damage to the horses caused by either his negligence or that of his employees.

Although *s.* 8651 makes it the defendant's duty to provide properly equipped pens for holding the horses while they are being fed, watered and rested, there is nothing in the statute itself, or in the purpose it is intended to serve, which even suggests that these pens must be on the defendant's right of way or that he must own them.

The defendant, therefore, could have performed his duty of providing pens by maintaining them either on his own land or on the land of others or by hiring them whenever he had occasion to use them.   In other words, the thing a carrier must do to avoid liability is to provide suitable pens.   It is immaterial who owns them or the land on which they stand.

Neither the facts that the pens were hired or that they were a distance from the railroad or that the approach to them was somewhat dangerous would be conclusive of their unsuitability, but merely

evidence to be considered with all the other relevant facts on the issue of suitability; for the test to determine that issue is to inquire whether they are such pens as the ordinary man would provide in a similar situation.

It follows that a pen which was perfectly suitable for holding horses in pleasant weather might be found to be unsuitable for that purpose on a night like that on which these horses arrived in Concord. *Drake* v. *Railway*, 24 So. Dak. 19; *Gilland* v. *Railway*, 85 S. C. 26.

The defendant was bound not only to provide suitable pens for holding the horses, but also to use ordinary care in unloading, feeding, watering and caring for them while they were resting. This was the duty the law imposes on the defendant for the plaintiff's benefit, and if he performed it the law gave him a lien on the horses for the expense incident to providing feed, water and care while the horses were resting. That is, the law makes it the duty of a carrier to provide suitable pens for holding the stock while they are resting and to feed, water and care for them, and secures his pay for doing these things by giving him a lien on the stock regardless of the location of the pens or who owns them.

It follows that if the defendant had taken these horses to a stable, he would have been entitled to pay for the "food, care and custody furnished" and he would have had a lien on the horses to secure his claim.

This brings us to the question of the validity of the defendants' exceptions to the charge as given. The court instructed the jury that "if it was the reasonable and proper thing to do, the defendant had the right to have the horses taken to a livery stable, there to be fed, watered and rested, and have a lien on them for the expenses." As we have seen, the defendant not only had that right, but the law made it his duty to put the horses in a suitable place for feed, water and rest. If, therefore, he had no such place of his own, it was his duty to hire one; but whether he would have a lien on the horses for all the expenses incident to putting them in a stable depends on what is intended by custody as that word is used in section 8652.

That section gives the defendant a lien for his reasonable expenses for the "food, care and custody furnished." If by custody is intended the use of the pens, the defendant's lien would include pay for the use of them as well as for the feed and care furnished. If, however, the freight included pay for the use of the pens as well as for the use of the car in which the horses were shipped, the lien the

law gave the defendant is limited to the reasonable expenses incident to feeding and caring for the horses while resting.

That is, if the defendant had sent these horses to a stable, he would have had a lien on them for the expenses of feeding and caring for them but not for what he paid for the use of the stable. It will not, however, be necessary to decide what is intended by custody.

It was the defendant's contention at the trial that he had no right to take the horses to a stable, that if he had it would have amounted to a conversion, and that he could not recover the expenses incident thereto. If that were true, it is obvious that he would have no lien on the horses. Nothing was said or done, however, to indicate that he was questioning the extent of the lien the law gave him by this exception. In short, he was contending that he would have had no lien if he had taken them to a stable, and the plaintiff was contending that he would have had the same lien that he would have if he rested the horses in his own pens.

If, therefore, the defendant had intended to question the extent of his lien when he took this exception, he should have called the court's attention specifically to that fact, and as that was not done he takes nothing by this exception. *Saladino* v. *Gurdy*, 80 N. H. 211, 214; *Gardner* v. *Company*, 79 N. H. 452, 456; *Bailey Lumber Co.* v. *Railroad*, 78 N. H. 94, 98; *State* v. *Fogg*, 80 N. H. 533.

The defendant embodied his contention, that the federal statute made it his duty to feed, water and rest the horses in properly equipped pens located in his own yard and that he had no right to take the horses to a stable, in a series of requests for instructions which were denied subject to his exception.

As we have seen, while the federal statute made it the defendant's duty to unload the horses into properly equipped pens when they reached Concord, it did not prescribe where the pens should be located. Since this is so, the defendant might have sent the horses to a stable, and if that was a suitable place to rest them, he would have had a lien on them for the "food, care and custody furnished."

In other words, it was the defendant's duty to provide a suitable enclosure to hold the horses while they were resting. It was immaterial, in as far as his lien was concerned, where it was located. If it was suitable, it was a properly equipped pen within the meaning of section 8651, and section 8652 gave him a lien on the horses for the expenses incident to caring for them in that enclosure.

The defendant also excepted to the court's refusal to instruct the jury that "the only duty the defendant owed the plaintiff was

to handle and care for the horses, in the matter of removing from the car and feeding, watering and resting, in accordance with the federal law and, under the circumstances, with due care, skill, and diligence."

This request is not an adequate statement of the law; for, as we have seen, it was the defendant's duty to use ordinary care to provide properly equipped pens for holding the horses while they were resting as well as to use such care in unloading the horses and in feeding and watering them.

The plaintiff sent an employee for the horses, who signed a receipt in which it was stated that the horses were received "in apparent good order," and the defendant asked the court to instruct the jury as follows:

"The plaintiff claims that because of the obvious condition of the horses the defendant should have put them in a stable instead of in the pen he provided for that purpose. On this question you may give consideration to the fact that the plaintiff thereafter received the horses and receipted for them as being in apparent good condition; for, if their condition 'was apparently good' to the plaintiff, it may have been the same to the defendant, and if so it could not be claimed they needed any special treatment or care other than putting them in the pen in the usual way."

Whether the court erred in refusing to give this instruction depends on whether there was evidence to which it was applicable; and as the evidence has not been transferred it must be held that if the court could properly refuse to give it under any possible circumstances, the defendant's exception fails.

If, for example, there was no evidence from which it could be found that the man who signed the receipt had seen the horses before he signed it, it is obvious that the request was properly denied, and that would also be true if the court found that permitting the jury to consider this receipt would introduce so many collateral issues into the trial that it would be more likely to confuse than to aid the jury in its search for the truth.

*Exceptions overruled.*

All concurred.